STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2023 KA 0117

STATE OF LOUISIANA

VERSUS

TERRELL LEE ANTHONY

Judgment Rendered: **NOV 0 3 2023**

* * * * *

On Appeal from the
21st Judicial District Court
In and for the Parish of Livingston
State of Louisiana
Trial Court No. 40496

Honorable Erika W. Sledge, Judge Presiding

* * * * *

Jeanne Rougeau                           Attorneys for Appellee,
Scott Perrilloux                         State of Louisiana
Brett Sommer
Livingston, LA


Lieu T. Vo Clark                         Attorney for Defendant-Appellant,
Mandeville, LA                           Terrell Lee Anthony


* * * * *

BEFORE: McCLENDON, HESTER, AND MILLER, JJ.

**HESTER, J.**

The defendant, Terrell Lee Anthony, was charged by an amended grand jury indictment with first degree murder[1] (count one), a violation of La. R.S. 14:30, and being a convicted felon in possession of a firearm or carrying a concealed weapon (count two), a violation of La. R.S. 14:95.1. He pled not guilty, and, after a trial by jury, was found guilty as charged on both counts. The trial court denied the defendant's motion for new trial and motion for post-verdict judgment of acquittal. The trial court sentenced the defendant to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count one, and twenty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count two. The trial court ordered that the sentences be served consecutively. The defendant now appeals, assigning error to the denial of his post-trial motions in a counseled brief, and to the sufficiency of the evidence on count one in pro se and counseled briefs. For the following reasons, we affirm the convictions and sentences.

## STATEMENT OF FACTS

On October 7, 2019, approaching midnight, the Livingston Parish Sheriff's Office (LPSO) was informed that the defendant shot to death his estranged wife, Jessica Clark, at her residence in Denham Springs, located at 9114 Rue De Fleur Drive. Earlier that day, Marcus Guilliard, Clark's son, returned home from school around 3:00 p.m.[2] He entered the garage and saw the defendant "crouched" in front of Clark's vehicle. Clark was not home at the time, but she was scheduled to return home from a vacation later that evening. As Guilliard entered the house from the

---

[1] The State did not seek the death penalty in this case. The indictment was amended only as to the predicate offense on count two, which is not at issue herein.

[2] Guilliard's nanny, Shirley Williams, and his younger brother, Terrell Anthony, Jr., the defendant's son with Clark, were also present at the time of the shooting. However, they did not testify at trial, because Williams was deceased, and Anthony Jr. was only two years old at the time of the shooting.

2

garage, the defendant followed him inside and remained there until Clark got home at around 11:00 p.m.

As Guilliard was putting his mother's luggage in her bedroom, he heard her scream, ran into the hallway, and saw the defendant pointing a gun at her. The defendant also had Clark's cell phone at the time. The defendant led Clark into the living room, where he sat on the couch and scrolled through Clark's cell phone, still armed with the gun. The defendant shot Clark several times before walking out to the garage only to return to the living room, and fire additional shots at Clark. As the defendant fled, Guilliard ran to the nearby home of a friend, whose father called 911. The defendant later turned himself in at the Livingston Parish Detention Center.

## SUFFICIENCY OF THE EVIDENCE ON THE COUNT OF FIRST DEGREE MURDER

In his counseled brief, the defendant argues the trial court erred in denying his motion for post-verdict judgment of acquittal (assignment of error number one) and his motion for new trial[3] (assignment of error number two) because the evidence was insufficient to support the verdict of first degree murder (assignment of error number three). He argues the evidence, instead, only supports a verdict of manslaughter, as the offense was a crime of passion. In his pro se brief, the defendant argues the State failed to prove the murder was committed during the

---

[3] As indicated, the counseled brief consists of three combined assignments of error challenging the sufficiency of the evidence on count one. We note that the question of the sufficiency of evidence is properly raised by a motion for post-verdict judgment of acquittal. See La. Code Crim. P. art. 821. A motion for new trial presents only the issue of the weight of the evidence and is examined under the so-called thirteenth juror standard, under which the trial judge reweighs the evidence. Appellate courts may review the grant or denial of a motion for new trial only for errors of law. See La. Code Crim. P. art. 858. Accordingly, the denial of the defendant's motion for new trial, in part based on La. Code Crim. P. art. 851(B)(1), is not subject to review on appeal. **State v. Francis**, 2019-1392 (La. App. 1st Cir. 12/17/20), 318 So.3d 862, 867 n.6.

3

commission of an aggravated burglary, which is an essential element of first-degree murder, as it occurred at the residence that he and the victim shared.[4]

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV, La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Mellion**, 2021-1116 (La. App. 1st Cir. 4/8/22), 342 So.3d 41, 45, writ denied, 2022-00732 (La. 6/22/22), 339 So.3d 1186, cert. denied, ___ U.S. ___, 143 S.Ct. 319, 214 L.Ed.2d 141 (2022).

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 982. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **Mellion**, 342 So.3d at 45.

First degree murder is the killing of a human being when the offender has the specific intent[5] to kill or to inflict great bodily harm and is engaged in the

---

[4] The defendant is not challenging his identity as the shooter or the conviction on count two.

[5] Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be formed in an instant. Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from circumstances surrounding

4

perpetration or attempted perpetration of one of the felonies enumerated in La. R.S. 14:30(A)(1), including aggravated burglary. See La. R.S. 14:30(A)(1). Aggravated burglary is defined, in pertinent part, by La. R.S. 14:60 as the unauthorized entering of any inhabited dwelling where a person is present, with the intent to commit a felony or any theft therein, if the offender is armed with a dangerous weapon. See also La. R.S. 14:62.3(A). The accused must have had the specific intent to commit either a felony or a theft at the time of his unauthorized entry. **State v. Bridgewater**, 2009-0053 (La. App. 1st Cir. 6/19/09), 2009 WL 1706718, *3 (unpublished), writ denied, 2009-1626 (La. 4/30/10), 34 So.3d 281.

The Louisiana Supreme Court has defined an unauthorized entry prohibited by the aggravated burglary statute as an entry without consent, express or implied. **State v. Ortiz**, 96-1609 (La. 10/21/97), 701 So.2d 922, 931, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). In the case of a private dwelling, a person must have the consent of an occupant or an occupant's agent to constitute a defense to unauthorized entry. This consent must be given by a person with the authority and capacity to consent. The consent must be voluntary and intelligent, that is, based on a reasonable understanding of the identity *and* purpose of the intruder. **State v. Lozier**, 375 So.2d 1333, 1336 (La. 1979).

Manslaughter is a homicide that would either be first or second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his cool reflection and self-control. See La. R.S. 14:31(A)(1). The elements of sudden passion and heat of blood are mitigating factors in the nature of a defense, and when such factors are established by a preponderance of the evidence, a verdict for murder is

---

the offense and the defendant's actions. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. **State v. Livous**, 2018-0016 (La. App. 1st Cir. 9/24/18), 259 So.3d 1036, 1040, writ denied, 2018-1788 (La. 4/15/19), 267 So.3d 1130.

5

inappropriate. Provocation and time for cooling are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self-control. If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. **State v. Leger**, 2005-0011 (La. 7/10/06), 936 So.2d 108, 170-71, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing Reporter's Comment to La. R.S. 14:31).

At trial, the State presented home surveillance footage that showed the defendant entering Clark's subdivision on foot the day before the shooting. The defendant approached the home's front door and then walked away. The defendant next approached the garage door, climbed up to the garage windows by standing on an object, and looked through the windows. The defendant tried to enter the house from another door that was apparently locked. Subsequently, the surveillance footage captured him exiting the home from that door, closing the door, then pushing the door, to see if it was locked. Later that day, the defendant is shown on footage peeking into the door, pulling the door open, and reclosing it.

Home surveillance footage from the following day, which was the day of killing, showed the defendant repeating the same type of behavior. He was captured on surveillance footage entering, exiting, and re-entering the subdivision on foot. He appeared to survey the home by pulling on doors and peeking inside, and ultimately gained entry.[6]

Guilliard testified that the defendant moved in with him and his mother when they lived in Port Allen, when Guilliard was six years old. According to the marriage certificate introduced at trial, the defendant and Clark were married in November of 2018. Guilliard was around twelve years old at the time of the shooting and was

---

[6] According to trial testimony, the timestamps on the footage which was collected from seven cameras, are several minutes off from the actual time. The timestamp for Clark's arrival at home, just prior to the killing, was 00:17:57, October 8, 2019.

6

fifteen years old at the time of the trial. He stated that while the defendant lived with Guilliard and Clark most of the time, he was often "kicked out" but would return. The defendant lived with them when they first moved to Denham Springs, at the residence where the killing took place. According to Guilliard, the defendant and Clark broke up prior to the shooting, and the defendant was forced to move out of the residence. Guilliard could not recall when the defendant was told to leave the Denham Springs residence, but said that Clark told the defendant not to come back. However, Guilliard said the defendant would "randomly" come back and "sneak" into the house when they were asleep, gaining entry through a window.[7]

Prior to the shooting, Clark had been on vacation in Las Vegas. Guilliard estimated that she had been gone for a few weeks. Guilliard testified that he was not sure who Clark was with in Las Vegas. Guilliard had not seen the defendant at the residence for at least a week. Guilliard stated that he did not invite the defendant into the residence on the day in question and was unaware of the defendant being there the day before. When Guilliard entered the home through the garage after school on the day in question and saw the defendant, the defendant told him not to close the door and entered the house with him. Further, the defendant told Guilliard and Williams to go to a room in the back of the house, and he took their cell phones. Around 10:00 p.m., as instructed by the defendant, Guilliard talked to Clark by phone to find out how close she was to home. Guilliard testified he complied, and that he did not tell Clark the defendant was waiting there, noting that the defendant was listening to the phone call.

When Clark got home, the defendant walked Guilliard to the garage and told him not to tell his mother that the defendant was there. As Guilliard was putting Clark's luggage in her bedroom, the defendant pulled out his gun, took Clark's cell

---

[7] Consistent with Guilliard's trial testimony, when the 911 operator asked Guilliard if the defendant lived at the residence, he replied, "No, he just pops up randomly."

7

phone, and pointed the gun at Clark. Guilliard observed the defendant lead Clark into the living room at gunpoint, sit Clark on the couch while he was next to her scrolling Clark's cell phone. Clark tried to get from the couch to take the cell phone away from the defendant, but he pointed the gun back at her, and she fell back. The defendant fired a gunshot at the floor, and then continued scrolling through Clark's cell phone. Guilliard testified that the defendant looked through Clark's phone for approximately ten minutes. The defendant then fired approximately six shots at Clark. The defendant paused for a moment, went back out to the garage, and then returned inside the home. As Clark was lying on the living room floor, the defendant fired approximately two more shots at Clark.

When the police arrived at the scene, Clark was deceased. Her body was lying in a pool of blood in the living room, surrounded by shell casings. The police collected nine 9-millimeter shell casings and three .45 caliber shell casings. The parties agreed by stipulation at trial that Clark died from multiple gunshot wounds. During the autopsy, projectiles were recovered from her mouth, forehead, back, shoulder, and wrist, and a fragment was found in her hair. The case investigator, Detective Brandon Ashford of the LPSO, testified that the presence of the two different caliber of bullets casings at the scene indicated that two guns were fired, as a 9-millimeter gun is incapable of firing a .45 caliber bullet.

After the defendant turned himself in to the police, he was advised of his **Miranda**[8] rights, signed a waiver of rights form, and agreed to provide a recorded statement. The defendant pointed out during the statement that he was married to Clark. The defendant did not claim that he currently lived at the residence, instead indicating that a friend dropped him off before the shooting. Thereafter, the defendant asked for counsel.[9]

---

[8] **Miranda v. Arizona**, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).
[9] The rest of the defendant's statement was suppressed by trial court after a motion to suppress hearing.

Clark's sister, Jeanetta Jackson, the sole defense witness, testified that she did not know who Clark was with while on vacation in Las Vegas. She stated that she did not recall posting a Facebook message indicating that Clark was in Las Vegas with a man. She testified that she had deleted her Facebook messages "that day" for "[n]o reason."

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. **State v. Alexander**, 2014-1619 (La. App. 1st Cir. 9/18/15), 182 So.3d 126, 131, writ denied, 2015-1912 (La. 1/25/16), 185 So.3d 748. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. The trier of fact can accept or reject, in whole or in part, the testimony of any witness. **State v. Lavy**, 2013-1025 (La. App. 1st Cir. 3/11/14), 142 So.3d 1000, 1006, writ denied, 2014-0644 (La. 10/31/14), 152 So.3d 150.

In his pro se brief, the defendant argues he should not have been convicted of first degree murder, as the State failed to prove beyond a reasonable doubt that he did not have authority to be in the house where he killed Clark. However, the jury rejected this hypothesis of innocence. As noted, a person must have the consent of an occupant or an occupant's agent to constitute a defense to unauthorized entry. This consent must be given by a person with the authority and capacity to consent. The consent must be voluntary and intelligent based on a reasonable understanding of the identity *and* purpose of the intruder. See **Lozier**, 375 So.2d at 1336. Guilliard testified the defendant was no longer a resident of the home, was forbidden by Clark to be there, had snuck in, and was not invited inside. Further, Guilliard, who was

9

only twelve years old at the time, was unaware of the defendant's nefarious, unlawful purpose. The defendant followed Guilliard into the main house on the day of the killing, and Guilliard did not voluntarily and intelligently consent to the defendant's entry. See **Lozier**, 375 So.2d at 1336. Further, the defendant's behavior on the surveillance footage was not consistent with the behavior of a person who had the authority to enter the home. The evidence offered at trial shows that the defendant repeatedly approached the subdivision and home on foot and gained entry to the home without a key. He waited in the garage until Guilliard came home from school that day, at which point he was able to gain entry to the main house. The defendant took the cell phones of Guilliard and Williams; later had Guilliard speak to Clark over the phone to see when she would be back; told Guilliard not to tell Clark that he was there; confronted Clark with a gun as soon as she got home; and killed her in two separate rounds of gunfire. In reviewing the evidence presented at trial, we cannot say that the jury's determination that the defendant entered the home without authority or valid consent was irrational under the facts and circumstances. See **Ordodi**, 946 So.2d at 662.

In his counseled brief, the defendant claims he was enraged after discovering that Clark had been on vacation with someone else, depriving him of self-control and cool reflection. We note that a defendant who claims provocation as a means of reducing murder to manslaughter has the burden of establishing the mitigating factors of sudden passion or heat of blood by a preponderance of the evidence. See **State v. LeBoeuf**, 2006-0153 (La. App. 1st Cir. 9/15/06), 943 So.2d 1134, 1138, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158. The record in this case is devoid of any evidence of provocation.

The defendant notes that he shot Clark after looking through her cell phone. However, the defendant was armed with a gun before Clark got home and held her at gunpoint prior to looking through her cell phone. The evidence herein fully

10

negated the defendant's claim that he killed Clark in the heat of the moment. A jury could have reasonably concluded that the defendant snuck into the garage and then followed Guilliard into the home where he laid in wait[10] for Clark to return. He told Guilliard not to tell Clark he was there, and pulled out a gun as Clark entered the house. The defendant shot Clark several times, paused, left the room, then returned to fire more shots at Clark with a second gun. These actions were consistent with the execution of a calculated plan to commit murder and were, thus, inconsistent with the theory of manslaughter. See **State v. Ellis**, 42,286 (La. App. 2d Cir. 7/11/07), 961 So.2d 636, 638-40, writ denied, 2007-1641 (La. 1/25/08), 973 So.2d 753 ("[the defendant] should have recovered his senses while lying in wait"). Thus, under the facts and circumstances presented in this case, we cannot say that the jury was irrational in determining that the defendant failed to prove the mitigating factors by a preponderance of the evidence. See **Ordodi**, 946 So.2d at 662.

After a thorough review of the record, we find that the evidence supports the jury's verdict. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of first degree murder. Thus, we find no merit in the counseled assignments of error or pro se supplemental brief.

## PATENT SENTENCING ERROR

---

[10] We note that the defendant was also seen parked in an empty parking lot near the house overnight on the date of the shooting. Specifically, Officer Dillon Hodges, a LPSO patrol officer at the time of the offenses, testified that he had contact with the defendant in the parking lot of a church located off of Highway 16, near Clark's residence, at approximately 1:45 a.m., on October 7, 2019. Officer Hodges' testimony, along with the surveillance footage, shows the defendant, apparently unsure as to exactly when Clark would return home from vacation, was lying in wait for quite some time before Clark returned.

Pursuant to Louisiana Code of Criminal Procedure article 920(2), this court routinely conducts a review of all appeals for error discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. After a careful review of the record, we have found a sentencing error in this case. Louisiana Revised Statute 14:95.1(B) mandates imposition of a fine of not less than $1,000.00, nor more than $5,000.00. The defendant's sentence on count two does not include a fine. Thus, the sentence imposed on count two is illegally lenient. However, since the error is not inherently prejudicial to the defendant, and neither the State nor the defendant has objected to or raised this sentencing error on appeal, we decline to remand for the imposition of a fine. See **State v. Price**, 2005-2514 (La. App. 1st Cir. 12/28/06), 952 So.2d 112, 124-25 (en banc), writ denied, 2007-0130 (La. 2/22/08), 976 So.2d 1277.

**CONVICTIONS AND SENTENCES AFFIRMED.**